**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **LATINA SOMMERS, UNNE HUGHLEY,** | § | |
| **D'JORIAN BRISCOE, JERMEKA** | § | |
| **BRISCOE, And TONY ROSS,** | § | |
| **Plaintiffs,** | § | |
| | § | **Civil Action No. 4:24-cv-810** |
| **Vs.** | § | |
| | § | |
| **TYSON FRESH MEATS, INC.,** | § | **Jury Requested** |
| **Defendant.** | § | |

**PLAINTIFFS' ORIGINAL COMPLAINT**

**<u>Jurisdiction and Venue</u>**

1.   This action, brought by Plaintiffs Latina Sommers ("Sommers"), Unne Hughley ("Hughley"), D'Jorian Briscoe ("DBriscoe"), Jermeka Briscoe ("JBriscoe"), and Tony Ross ("TRoss") (collectively, "Plaintiffs") allege variously race discrimination and retaliation in their terms and conditions of employment, disparate discipline, hostile work environment, or termination from employment in violation of their rights under 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991 (1991 Act) against Defendant Tyson Fresh Meats, Inc. ("Tyson").

2.   The Court has jurisdiction under the Fourteenth Amendment to the U.S. Constitution, as codified in the remedial legislation listed above and other federal statutes.

3.   There are no conditions precedent required to be exhausted and/or performed prior to the filing of the 42 U.S.C. §1981 (1991 Act) claims.

4.   Jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331, 1343, and 1658.

1

5. The acts or omissions, which serve as the basis for this cause of action, occurred in Grayson County, State of Texas and in this Division of the Eastern District of Texas; therefore, venue is proper in this Court. 28 U.S.C. §1391(b)&(c).

**<u>Parties</u>**

6. Sommers is a citizen of the United States and the State of Texas and resides in Grayson County, Texas. Sommers may be contacted through her attorney of record in this cause.

7. Hughley is a citizen of the United States and the State of Texas and resides in Grayson County, Texas. Hughley may be contacted through her attorneys of record in this cause.

8. DBriscoe is a citizen of the United States and the State of Texas and resides in Grayson County, Texas. DBriscoe may be contacted through his attorneys of record in this cause.

9. JBriscoe is a citizen of the United States and the State of Texas and resides in Grayson County, Texas. JBriscoe may be contacted through her attorneys of record in this cause.

10. TRoss is a citizen of the United States and the State of Texas and resides in Grayson County, Texas. TRoss may be contacted through his attorneys of record in this cause.

11. Tyson is a privately-owned for-profit corporation with the relevant business cite located in Sherman, Grayson County, Texas.  Tyson may be served through its registered agent for service of process, CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136.

**2**

**Factual Allegations**

**Racially Disparate Incidents Negatively Impacting All Black Employees in Sherman**

12.  Black employees are treated differently from non-black employees at Tyson in many different situations or are subjected to working in conditions that negatively impact their mental, emotional, and/or physical health and subject them to being forced to work under disparate working conditions compared to non-black employees.

13.  Some of these disparate treatments, harassment, hostility, and terms and conditions include, but are not limited to the following:

- No black employees on the Safety Sight Council,
- No black employees in the role of Complex Generals (and only one black employee in the role of Department General for the entirety of existence of Tyson's business in Sherman, now no longer in that role),
- No black employee in the role of Trainer,
- Disparately low percentage of black employees in management positions or other positions of authority,
- Black employees receive harsher punishments for the same, similar, or even lesser conduct compared to what non-blacks receive,
- Non-black employees receive lesser or no punishment despite their violating established policy(ies) or procedure(s) that call for specific levels of discipline, while black employees receive the prescribed disciplinary action or worse, and
- Racially derogatory comments and actions are not redressed or responded to by Tyson in a manner that protects the black employees or communicates to Tyson's workforce that such racially disparaging or disparate conduct is not acceptable and will not be tolerated.

14.  Some examples of racially derogatory comments or actions that have occurred at Tyson's Sherman facility in the several years prior to the filing of this original complaint include but are not limited to the following:

- A black-colored life-sized figure of a human was hung in the workplace on at least three occasions from approximately 2016 and onwards for several years. No disciplinary actions followed and instead of Tyson immediately and clearly communicating that such racially threatening/intimidating displays are unacceptable, condemned, and would not be tolerated, Tyson went about asking the black employees if they were "offended" by the

**3**

hanging of a black body figure in the workplace.  Additionally, Tyson tried to explain these racist actions away with pretextual explanations and using black employees to convey the pretextual explanations, which caused the black employees to feel even less protected due to Tyson's engaging in falsely justifying and defending the racist actions rather than speaking out against and stopping them.

- Allowing the use of the n-word in the workplace in conjunction with expressions of physical violence, such that the employee using the n-word at work remained employed.  For example:
  - Bo Ruth in early 2022 complained openly in the workplace about "niggers" getting all the holidays and whites did not;
  - David Medler in approximately March of 2022 saying in the workplace that he wished that all "niggers" were dead;
  - David Smith ("Smith"), a non-black employee, calling a black employee, Butler, the n-word in the workplace and in response, Tyson moved Butler to a different work location and Smith was not moved and instead was allowed to continue his employment without any consequences for his violations of law, policy, and Butler's rights;
  - Raquel Benedict, non-black, talking in the workplace and laughing about her son naming their black chicken, Obama, and despite complaints from employees about this being a racist comment and offensive in the manner in which it was being discussed and laughed at, Tyson did nothing to stop this conduct; and
  - Lacy Freeman, white, supervisor in ground beef, saying she doesn't like the n-words.
- Black Department General, Craig Savage ("Savage"), no longer employed by Tyson, was suspended and black Supervisor, MarQuintin Lamay ("Lamay") was demoted two levels to an entry level production worker because one of their subordinate employees committed a safety violation, yet, under the same or similar circumstances, white Department Generals and their white Supervisors were not disciplined at all (much less similarly) when their subordinate employees committed safety violations.  For example (all white):
  - Angie Jones ("Jones") and Johnny Clayton ("Clayton");
  - Jones and Patrick Robinson ("Robinson");
  - Jones and Amy Davison ("Davison"); and
  - Jones and Amy Schrum ("Schrum").
- Black employees openly mistreated by Tyson management compared to the way in which non-black employees are treated:
  - James Walker ("Walker"), black, was refused training for several weeks by Davison resulting in his separation from employment and replacement by a non-black employee.
  - Jacob Hawkins ("JHawkins"), black, was ignored and disrespected when white employees were not treated the same under the same or similar circumstances. JHawkins asked Savage for help because the disparate treatment was so bad and Savage took him in and assigned

**4**

JHawkins to work under Lamay because JHawkins was being treated badly by the white employees due to his race, black.

- o Alisa Phillips ("Phillips"), black, was terminated for pushing a white employee (David last name unknown) without an investigation (despite there being witness testimony and video footage that could have been retrieved and viewed) and even though the white employee was the aggressor and had pushed Phillips, yet the white employee, David, was not disciplined at all.
- o Flosay White ("white"), black, was terminated for being on her phone while on probation, when she wasn't on her phone and again no investigation was conducted and Tyson just took her supervisor's, Sarah Richardson's (white), word over White.
- o Savage was repeatedly denied promotions for fabricated pretextual reasons to allow non-black employees to get the promotions and keep Savage from getting those promotions, since Savage was the better qualified candidate for those promotions.

15. John Kyker ("Kyker"), the Tyson Sherman facility top HR administrator, admitted openly in the workplace that he knows that there is racial discrimination that exists in the Tyson Sherman facility.

16. Kyker has not acted to affirmatively reduce or eliminate the racially disparate and retaliatory mistreatment and harassment of the black employees at Tyson.

17. In fact, Kyker has acted to continue the racially discriminatory hostile environment and the prevalence of retaliatory responses to complaints and efforts to report and end racial discrimination in the workplace.

**Latina Sommers**

18. Sommers is African American.

19. Sommers worked for Tyson twice.

20. The first time from October 9, 2017 to December 5, 2017, at which time Sommers quit to care for her ailing mother.

21.  Then Sommers returned to work for Tyson the second time from July 20, 2020 to September 11, 2020, when Sommers was terminated by John Kyker for pretextual reason(s).

22.  Sommers had not completed her 90-day certification prior to her being terminated.

23.  Sommers was trained both by Pam Rice ("Rice") (black) from HR and from her trainer in Pork, that until Sommers is certified that Sommers was to leave at 12:30 am, which is earlier than the others that are certified on the shift.

24.  Therefore, prior to Sommers becoming certified in her position, Sommers would leave work early, as instructed from the beginning of her employment through to her termination.

25.  No one ever mentioned, counseled, or disciplined Sommers for leaving early, until the day of her termination when Kyker questioned Sommers regarding her leaving time.

26.  Sommers was the only black employee on her line and under her supervisor.

27.  A few days before Kyker terminated Sommers, Sommers had complained to her supervisor about Sommers's supervisor's rude treatment of her compared to the way the supervisor treated the rest of the non-black employees under Sommers' supervisor.

28.  The supervisor appeared upset with Sommers for complaining about being mistreated.

29.  On September 10, 2020, Sommers's daughter went into labor and Sommers called in to let Tyson know that she would be at the hospital with her daughter for the birth of Sommers's grandchild.

30.  Sommers followed the correct procedure as Sommers was trained for calling in to report that she would not be coming in to work due to such a medical event.

31. Sommers obtained a note from the hospital that she had been at the hospital on September 10, 2020.

32. Sommers turned in the hospital note to her supervisor when Sommers returned to work at the beginning of her shift that next day, September 11, 2020.

33. Sommers worked most of her shift before she was called into the HR office by the HR director, John Kyker ("Kyker").

34. Seated in Kyker's officer were Kyker, Francis Fan ("Fan"), and her supervisor.

35. Inexplicably, Sommers was made to remain standing during the entire meeting while the others sat.

36. Kyker asked all the questions while the two other management representatives remained silent.

37. Kyker asked Sommers where she was the previous day and Sommers told him that she was at the hospital with her daughter for the birth of her grandchild.

38. Kyker told Sommers, "you're lying." Kyker went on to tell Sommers that Tyson had called the hospital and was told that Sommers was not there.

39. This did not make any sense to Sommers, since she was at the hospital and had even provided a note which Sommers had received from the hospital confirming that Sommers was at the hospital.

40. Sommers complied with the policy and procedure that she had understood was the correct protocol for verifying the fact that Sommers had been at the hospital.

41. Kyker continued to ask Sommers over and over again where she was and Sommers repeatedly answered stating that she was at the hospital with her daughter.

42. Kyker maintained that Sommers was lying without explaining further to Sommers why Kyker based his assertion on during the entire meeting.

43. Kyker then, out of the blue, also went on to accuse Sommers of leaving work early against Tyson's rules and without approval from a supervisor, even though Sommers had been leaving early as instructed and for an extended period of time with no comment from any supervisor prior to this meeting.

44. Sommers told Kyker that she left when she was told to leave by the Tyson training (given by HR employee Rice) and the trainer on the line (a Hispanic woman, Sommers does not recall her name since Sommers was only trained about a week).

45. During the meeting, Kyker began also accusing Sommers of being aggressive toward Kyker, even though Sommers had not approached, gestured at, or physically or verbally threatened Kyker or any other participant in the meeting in any manner that could be reasonably construed as violent or even physical.

46. Kyker then told Sommers that he was going to let Sommers go, but that Sommers was going to be allowed to reapply to work at Tyson after 90 days.

47. However, Kyker had lied to Sommers.

48. Following Sommers's termination, Sommers learned that she was listed on Tyson's records as not being eligible for rehire.

49. Sommers has remained in this "no-rehire" status since she was terminated by Kyker in mid-September 2020.

50. Tyson did not have any legitimate non-discriminatory reason for terminating Sommers and not terminating the non-black employees that frequently left work without approval yet stayed on the clock and also did not terminate non-black employees that

actually engaged in aggressive conduct toward supervisors while Sommers had not engaged in such conduct yet was still terminated.

51.  Tyson never provided Sommers a reason to explain why she was terminated when no other non-black employee had ever been terminated for the same, similar, or worse conduct.

52.  Tyson provided pretextual reasons to Sommers to explain why Tyson terminated her (e.g., she lied about being at the hospital with her daughter while her daughter was giving birth, leaving work without approval, and being violent with Kyker, when no other non-black employee had ever been terminated for such false allegations).

53.  Tyson did not provide Sommers with any documentation supporting its allegations against Sommers.

54.  Sommers observed and believes that, in addition to herself, the following black employee was also treated differently because he is black or because he opposed discrimination at Tyson in Sherman: Savage.

55.  Sommers experienced a racially distinct and separated workplace while working for Tyson in Sherman compared to Sommers's experience working anywhere else in her life.

56. Sommers's racially discriminatory experiences included her own disparate experiences as well as those of other black employees and employees that had engaged in protected activity (to include but not be limited to: Sylvester Brown, Savage, and possibly others) being treated differently than the non-black and non-protected-activity-engaging employees as well as the consistent failure or refusal of Tyson to take actions to oppose or stop the racially offensive, retaliatory, and disparate conduct and actions that had occurred over a period of years prior to Sommers being terminated.

**9**

57.  The sum total of these consistent, known, repeated, and unremediated racially and retaliatory disparate mistreatment of Sommers and other black employees or employees that engaged in protected activities amount to a hostile work environment for all black employees at Tyson's Sherman facility during the actionable period in this case.

58.  No one should have to put up with that kind of mistreatment because of their race.

59.  As a result of Tyson's racially discriminatory actions against Sommers and other black employees, Sommers suffered economic and non-economic damages (humiliation, anxiety, depression, mental anguish and stress, sense of failure, lethargy), both statutory and equitable in nature, and attorney's fees and costs, for which he seeks recovery.

60.  Because of the consistent, unremediated, and known effect of much of the conduct complained of herein, Sommers also asserts that Tyson has engaged in intentional and malicious conduct such that it should be subjected to punitive damages to deter such conduct in the future.

**Unne Hughley**

61.  Hughley is African American.

62.  Hughley worked for Tyson in Beef Pack for over 10 years from August 26, 2013 April 1, 2024.

63.  Hughley was terminated on April 1, 2024 after being falsely accused of "pointing out."

64.  Hughley worked as an MTEK-operator in Beef Pack for her entire employment with Tyson and therefore was well trained and competent in her position.

65.  Hughley did not have a disciplinary record.

66.  Hughley had blood pressure issues that cropped up on her during her employment at Tyson due, at least in part, to the stress that Hughley experienced in the workplace with her observations of racially discriminatory and retaliatory mistreatment that black employees were experiencing as well as the racial discrimination that Hughley heard about from other black employees.

67.  Hughley's blood pressure resulted in Hughley accruing attendance points that she could not avoid because of the way that Tyson accounted for and misapplied points against Hughley's personnel record.

68.  Hughley's supervisor was Gabriel Jones ("GJones") and her co-supervisor on the same shift that worked along with GJones was Ahmed Alhammoodi ("Alhammoodi").

69.  On March 18, 2024, Hughley had 13 points.

70.  On March 18, 2024, Hughley was having stomach issues at work and reported to the Tyson nurse, Cherry Mikeske ("Mikeske"), seeking some sort of treatment or relief.

71.  Nurse Mikeske decided to send Hughley home.

72.  Hughley did not ask to be sent home.

73.  Nurse Mikeske reminded Hughley to be sure to bring a doctor's note when Hughley returned to work.

74.  When Hughley was sent home by the Tyson nurse, Hughley was aware from her 10+ years that she would not be assessed a point for this event because the nurse sent her home and she would return with a doctor's note.

75.  Hughley went to the doctor who told Hughley that she had a virus that was going around and that she would be able to return to work on March 20, 2024.

76.  Hughley obtained the note and turned it in to Nurse Mikeske.

**11**

77. Nurse Mikeske told Hughley that Nurse Mikeske would forward the note to Hughley's supervisor, so that he would be aware of her return to work.

78. Hughley returned to work on March 20, 2024 as directed by the doctor and confirmed with the doctor's note.

79. Neither HR, nor Hughley's supervisor made any mention of any issue with Hughley's stomach virus, doctor's note, missing days, or anything related to Hughley's absence or return to work after her return.

80. Hughley worked without incident following her return from being sick for ten days.

81. On the tenth day, Friday, March 29, 2024, Hughley alerted her line that the packages of meat that were arriving at her station from up the line had misplaced labels that were not acceptable according to Hughley's years of experience and training.

82. Hughley knew from her 10+ years that this would be a problem and would result in the packages being sent back up the line and requiring them to be re-worked and potential disciplinary actions might be forthcoming for those responsible for the lost time should these defects not be addressed and rectified.

83. Hughley took the following steps to fix the misplaced labels problem:

- Told co-workers, but received no help,
- Told workers up the line of the defects and they corrected the problem so that the mistake would not continue to be sent to her workstation, and
- Then asked her co-worker to help correct the labels that had already stacked up at their workstation, but Hughley did not receive any help from this co-worker, so Hughley started fixing the errant labels before sending the corrected packages down the line.

84. At some point, General Michael Portman ("Portman"), arrived on the line and after speaking to everyone else, Portman asked Hughley what the problem was.

85. Hughley explained the issues with the labels, as recounted above.

**12**

86.  In response, Portman stated that he did not see a problem.

87.  In response to Portman's statement, Hughley said, "Ok," and then turned around, stopped fixing the misplaced labels and started sending the packages down the line since the General said that they were ok.

88.  Hughley did not argue or even question Portman's assessment even though Hughley knew that the labels were incorrectly placed and would normally lead to orders to the employees to rework those packages after reviewed by the inspectors further down the line.

89.  After Hughley assented to Portman's statement and went back to work, Portman turned to leave and while leaving Portman stated over his shoulder at Hughley in an upset and aggressive tone at Hughley, "You need to calm down before I hose you down."

90.  Hughley, couldn't believe both what Portman said to her and the way he said it and it upset Hughley.

91.  Hughley was upset at being threatened and disrespected in this manner because that comment about "hosing" her down was such a well-known racially degrading and historically racist control technique that has no redeeming use or basis in the workplace at Tyson.

92.  Interestingly, Hughley had not even been upset in the first place. Once Portman said the labels were ok, Hughley could stop doing extra work and would also not be blamed for any misplaced labels. Hughley had no reason to be upset.

93.  In response to Portman's insulting and degrading statement, Hughley turned around and asked Portman, "What did you say to me?"

**13**

94. In response to Hughley's questioning of Portman's use of this racially degrading comment to her, Portman immediately turned around to face Hughley and said it again, but this time in a very loud and angry voice and with a reddened face and with violent gestures of both his arms indicating that he was done with Hughley and did not want to hear another word about it.

95. Hughley never saw Portman act that way with any non-black employee.

96. The next workday, Monday, April 1, 2024, after working most of the shift, Alhammoodi told Hughley that Portman wanted to see her in his office.

97. When Hughley got to the office, Portman was talking to GJones.

98. Portman then left GJones's office without saying a word to Hughley and went into his own (Portman's) office by himself.

99. Portman never said a word to Hughley on April 1, 2024.

100. GJones, with Alhammoodi, in the office, told Hughley that they were going to let Hughley go because Hughley had "pointed out."

101. There was no HR representative present in this meeting.

102. GJones then told Hughley that this is no one's business, so they were going to walk Hughley out the back door.

103. However, after leaving the floor, Hughley went to HR to get a form to request a meeting with the Plant Manager, Tom Sharp ("Sharp").

104. Tyson had such a form that an employee like her could request to appeal her termination to a higher-ranking Tyson representative.

105. Hughley filled out the form and turned it in before leaving the facility that same day.

**14**

106. The next day, Stephanie Webb ("Webb"), called Hughley and asked her if she could come in to meet with Sharp the next day, April 3, 2024, at 11:30am. Hughley said she could.

107. When Hughley met with Sharp, without asking Hughley any questions and without allowing Hughley to explain her grievances, Sharp stated that he could not help Hughley with pointing out.

108. Hughley did not understand that comment, so she went on to ask why they had her working for ten days before then attempting to enforce a "pointing out" from 10 days before.

109. Sharp responded that he did not know and he stated that, "someone is going to have some explaining to do on that."

110. Sharp said that he was going to investigate that and stated that he could not make Hughley any promises.

111. The next day, Webb called Hughley and told her that Sharp was going to stay with termination.

112. Webb stated that Hughley could reapply after six months.

113. Hughley knows that the basis for her termination, "pointing out," was a pretext because the circumstances of her absence would not result in receiving a point.

114. Additionally, there is no reason that if that was a circumstance that a point would be assessed, that point would have been assessed upon Hughley's return on March 20, 2024, instead of thirteen days later.

115. Additionally, it was suspicious of a retaliatory motive that Hughley was being disciplined only one working day after Hughley had stood up to Portman's racist threat

screamed in anger at Hughley for daring to question his use of the racist threat of "hosing" her down if she didn't calm done, again, even though she had not been upset.

116. Additionally, there are plenty of non-black employees at Tyson that have screamed and yelled at their supervisors that are not disciplined, much less terminated.

117. In Tyson employment parlance, "pointing out" means Hughley had accrued too many attendance violation points that Tyson policy states automatically results in termination.

118. By Tyson policy, 14 attendance points results in termination.

119. By Tyson practice, though, if an employee is not black, or otherwise engages in illegal conduct, then 14 points and more have not resulted in termination on multiple occasions, including with Raul Torres, Vanessa Reyes, and other non-black employees.

120. Hughley was pretextually assessed 14 points and terminated either because she is black or because she stood up against a known racist at Tyson, Portman (rank of General), who had threatened Hughley with a racially degrading action – hosing down – used against blacks in racist contexts and also against animals.

121. Over Hughley's 10+ years working at Tyson, she had observed racially disparate mistreatment of black employees including against Savage, Ross, and DBriscoe.

122. Hughley has also heard of racially discriminatory mistreatment of black employees throughout her 10+ years working at Tyson by others, to include: David Medler using the n-word at work regarding Tyson's black employees and the Hank lynching incidents and the obviously false explanations that the hangings of the black mannequin were safety demonstrations and Tyson never took any action to discipline anyone for those horridly racist actions.

123. Hughley witnessed more than once that Tyson would deny Savage promotions, based upon some contrived, unusual, unfair, false, or racially disparate reason and instead give the promotion to a non-black employee that was not as qualified for the promotion as Savage.

124. As an example, Tyson suspended Savage for circumstances that were never used against non-black employees in Savage's same or similar circumstances.

125. These unprecedented and repeated denials of promotions to Savage were matters of common discussion on the factory floor at Tyson among black and non-black employees.

126. Hughley observed that while the black employees would openly discuss that Savage was racially discriminated against by Tyson passing Savage over in favor of less qualified non-black employees, the white employees would talk about Savage being passed over as unfair or not making sense.

127. Hughley never saw any black employee get as high as Savage in management at Tyson in the Sherman facility.

128. Hughley's experience was that HR does not protect its black employees.

129. Hughley has worried about retaliation for complaints of racial discrimination in the workplace at Tyson.

130. Hughley feels that the leadership of Tyson is the problem with race discrimination and retaliation because over the last 10+ years Tyson has not stopped the discrimination and retaliation.

131. Hughley observed several non-black management representatives from Tyson treat black employees differently and worse than non-black employees, including Portman, Kyker, and Webb.

132. Tyson did not have any legitimate non-discriminatory or non-retaliatory reasons for disparately mistreating Hughley compared to the non-black employees or employees that had not engaged in protected activities who were in the same or similar circumstances as Hughley.

133. Tyson provided no reasons or provided pretextually false reasons for disparately mistreating Hughley for racially discriminatory or retaliatory reasons.

134. Hughley's racially discriminatory or retaliatory experiences included her own disparate experiences as well as those of other black employees and employees that had engaged in protected activity (to include but not be limited to: Savage, DBriscoe, Ross, and possibly others) being treated differently than the non-black and non-protected-activity-engaging employees as well as the consistent failure or refusal of Tyson to take actions to oppose or stop the racially offensive, retaliatory, and disparate conduct and actions that had occurred over a period of years prior to Hughley being terminated.

135. The sum total of these consistent, known, repeated, and unremediated racially and retaliatory disparate mistreatment of Hughley and other black employees or employees that engaged in protected activities amount to a hostile work environment for all black employees at Tyson's Sherman facility during the actionable period in this case.

136. No one should have to put up with that kind of mistreatment because of their race or protected activities.

137. As a result of Tyson's racially discriminatory or retaliatory actions against Hughley and other black employees, Hughley has suffered economic and non-economic damages (humiliation, anxiety, depression, mental anguish and stress, lethargy, headaches, high blood pressure (after started working at Tyson), weight loss, sleeplessness, and hair loss),

both statutory and equitable in nature, and attorney's fees and costs, for which she seeks recovery.

138. Because of the consistent, unremediated, and known effect of much of the conduct complained of herein, Hughley also asserts that Tyson has engaged in intentional and malicious conduct such that it should be subjected to punitive damages to deter such conduct in the future.

**D'Jorian Briscoe**

139. DBriscoe is African American.

140. DBriscoe worked for Tyson in Loadout on A-Shift from November 12, 2023 through to February 6, 2024.

141. During the entire time that DBriscoe worked for Tyson, he was qualified for and performed the duties of his job at or above the expectations that Tyson had for employees in the role that DBriscoe filled.

142. DBriscoe worked as a Palletizer under Supervisor Stan Smith ("Smith").

143. Smith reported to General Wayne Grover ("Grover") (white).

144. Smith is African American.

145. Smith has a long-established history of mistreating black employees or employees that engage in protected activities compared to how Smith treats non-black employees or employees that don't engage in protected activities.

146. Part of Smith's reputation is that he is used by Tyson to get rid of black employees and employees that complain of or stand up against discrimination at Tyson.

147. Tyson had a practice of getting rid of black employees in various ways, to include insuring that the terminations occurred prior to the end of the 90-day probationary period.

**19**

148. DBriscoe was warned about Smith mistreating black employees by Starla McKinney, Unne Hughley, Trina Briscoe, and Jermeka Briscoe.

149. DBriscoe was also warned by Supervisor Johnny Clayton ("Clayton"), who advised DBriscoe to work his 90 days under Smith and then get out from under Smith.

150. When DBriscoe worked under Smith, there were four black employees under Smith: DBriscoe, Jalan Jones ("JJones"), Victor McNeely ("McNeely"), and Brian Gabriel ("Gabriel").

151. Therefore, DBriscoe was subjected to different terms and conditions of employment due to his race in violation of the law relegating DBriscoe to a lower class of employee based on his race in violation of the law.

152.

153. DBriscoe was working on Line 2 in the early part of January 2024. Line 2 is reputed to be the most difficult line. During the shift, the co-worker, Isaac Salazar ("Salazar")_ (Hispanic), that was working the line with DBriscoe went to lunch and no one was assigned to nor did anyone assist DBriscoe with the work.

154. As a result, DBriscoe started running behind and utilized the E-Stop cord which stopped the flow of the line, so that DBriscoe had a chance to catch his breath and not fall behind in the process and therefore risk the quality of the product for which he was responsible.

155. The Lead on floor at the time, Delfino Cruz ("Cruz"), immediately came down and asked DBriscoe why he had pulled the E-Stop cord. DBriscoe told him that he needed to catch his breath. Cruz immediately restarted the line without checking on DBriscoe's wellbeing and without any further discussion with DBriscoe.

156. DBriscoe had been trained by everyone that the E-Stop cord was for just such occasions when an employee feels overwhelmed and that there were no negative consequences for utilizing the E-Stop cord when deemed necessary.

157. No one trained DBriscoe any differently nor showed DBriscoe any policy that prohibited or restricted the use of the E-Stop cord when needed like DBriscoe had used it that day.

158. DBriscoe's Lead, Robert Leisher ("Leisher") (white), never trained DBriscoe on the rules related to the use of the E-Stop cord. DBriscoe did not worry about this because the training that DBriscoe had received up to that point on the E-Stop cord was consistent and straight forward.

159. DBriscoe has seen other non-black employees, (e.g., Jimmy Carlson ("Carlson")), use the E-Stop cord repeatedly with no consequences against them.

160. Quality control leaves at 3pm so everyone throws everything on the line which results in 60 minutes of intense work.

161. The E-Stop cord is covered by a video camera, so it is visible at all times with the video while the line is running and Tyson is able to know and document every occurrence and who pulled the cord and therefore who was and was not disciplined for utilizing the E-Stop cord.

162. However, the day after DBriscoe pulled the E-Stop cord, Stan Smith ("Smith") called DBriscoe into the office where there was one other yellow-hat supervisor, Chad Broer (Broer") (white). DBriscoe's Lead, Leisher, was also present but did not say a word.

**21**

163. Smith told DBriscoe that it was, "unacceptable for you to pull the E-Stop cord unless it is an emergency."

164. Broer began making unhelpful wise-cracks in the back ground like, "the line only has one speed", without addressing the E-Stop cord and why it is there at all.

165. Broer also said that he could check the camera, but no one ever checked the camera to DBriscoe's knowledge and DBriscoe was not allowed to see the video.

166. DBriscoe, knowing that Smith had a history of black employees complaining about Smith discriminating against them, responded to Smith's allegations against DBriscoe by saying that, "we could go to HR about this."

167. Smith responded that for DBriscoe to be able to go to HR, that DBriscoe would have to first go through Smith's supervisor to get his permission.

168. Smith's statement is false and contrary to Tyson policy and is a direct effort to retaliate against DBriscoe by trying to intimidate DBriscoe so that DBriscoe would not go to HR to report racial discrimination.

169. Smith backed off and did not write up or otherwise put DBriscoe on warning regarding DBriscoe's pulling of the E-Stop cord that day.

170. After the meeting, DBriscoe's Lead, Leisher, told DBriscoe that DBriscoe was correct regarding the reason for the E-Stop cord being there and that DBriscoe's use of the E-Stop cord that day was correct.

171. It was clear to DBriscoe that Leisher was afraid to stand up to Smith or Broer by the way that Leisher said nothing during the meeting and only spoke up to DBriscoe after they had left the meeting.

172.

173. When DBriscoe went to the nurse for his 8-week check-up on January 8, 2024, Smith went with DBriscoe and was on the room with him and the nurse.

174. It is not normal (not a part of Tyson policy) for a supervisor to be in the room with the employee and the nurse during the 8-week check-up.

175. DBriscoe complained to the nurse about some pain in his back due to the constant lifting of the boxes of meat and stacking them on the pallets throughout the shift. DBriscoe reported that the pain had started over the last month of his work.

176. The nurse told DBriscoe that he should report any pain immediately and not wait.

177. The nurse placed DBriscoe on light duty which amounted to DBriscoe only lifting 50% of the crates instead of every single crate, going to the nurse for treatment a couple of times a day,[1] and never working by himself.

178. After a couple of weeks of light duty, Smith approached DBriscoe and told DBriscoe that DBriscoe had to tell the nurse that DBriscoe's pain is now "zero" so that DBriscoe could be medically cleared from light duty.

179. However, DBriscoe still had back pain and therefore saying his pain was zero, would have been untrue. So DBriscoe did not report to the nurse that his pain was zero like Smith had told DBriscoe to report.

180. Smith did not ever tell a non-black employee to tell the nurse there was no pain when there was to get the employee cleared from light duty.

181. DBriscoe was continuing to require treatments a couple of times a day during his shifts.

---

[1] Treatment entailed 30 minutes with the icepack on the back and two pills for inflammation.

**23**

182. Smith also restricted DBriscoe's access to his treatments to only the 30 minutes before lunch and the 30 minutes before clock-out time, even though the nurse had not restricted DBriscoe's access to the treatment to specific times of the shift.

183. Every time that DBriscoe went to get treatment from the nurse, Smith would go with DBriscoe.

184. DBriscoe never saw Smith follow the non-black employees off the floor to the nurse or elsewhere consistently like he followed DBriscoe.

185. Over the duration of his treatments across several weeks, while in the nurse's office with the icepack on his back for 30 minutes, DBriscoe would take the time to scroll on his phone, since he had nothing to do but stare at the wall for 30 minutes.

186. DBriscoe had never been trained or told that he was not allowed to have his phone out while he was receiving treatment in the nurse's office.

187. DBriscoe did not take any pictures or otherwise violate anyone's privacy, nor did Tyson accuse DBriscoe of doing anything other than having his phone out while in the nurse's office.

188. Every time that DBriscoe used his phone during previous treatments, DBriscoe had not received any warnings, cautions, reprimands, criticisms, or discipline.

189. However, one day, Smith called DBriscoe into Smith's office with another supervisor, Anthony Moreno ("Moreno"), to discipline DBriscoe for using his phone in the nurse's office.

190. While in the meeting, Moreno, instead of acting as a witness, began harassing and taunting DBriscoe.

191. After this meeting, Moreno would repeatedly stare down DBriscoe with stern looks whenever Moreno was around DBriscoe, which began to increase in number and consistency compared to the months before the meeting and for no work-related reason.

192. DBriscoe felt that Moreno was attempting to intimidate him.

193. One of DBriscoe's black co-workers, McNeely, was in his 70's.

194. Smith assigned McNeely to work on the end of Line 2, which is the hardest assignment on any line in palletizing.

195. DBriscoe observed that McNeely was becoming overwhelmed with the flow of the crates and was falling behind.

196. DBriscoe also observed that no one was going over to assist McNeely.

197. DBriscoe got his line in shape and then went over to help McNeely, but DBriscoe's Lead, Leisher, told DBriscoe that he is not allowed to go help McNeely because Smith wanted McNeely to drown on Line 2.

198. It got so bad on Line 2 that the crates started to fall off the line and onto the floor.

199. Each box of meat weighs about 15-20 pounds.

200. At that point, McNeely pulled the E-Stop cord.

201. Smith came over to the line after McNeely pulled the E-Stop cord.

202. DBriscoe questioned Smith regarding why Smith had assigned McNeely to Line 2.

203. Smith told DBriscoe that it was not DBriscoe's call.

204. Smith told DBriscoe to go back to work on his line.

205. DBriscoe complied with Smith's directive by turning around and returning to his line as Smith had instructed without comment.

206. There was also another co-worker in his 70's that was a palletizer named Jimmy Carlson ("Carlson") (white).

207. Smith never assigned Carlson to work the difficult assignment at the end Line 2.

208. Whenever Carlson would slow down and get backed up on his work on the other lines, the Leads would step in and assist Carlson with his work.

209. This kind of help was not provided to the black palletizers like McNeely and DBriscoe.

210. This racially disparate treatment between Carlson compared to McNeely was in the minds of the black employees when McNeely was falling behind that day and DBriscoe was told that he could not help McNeely and no one else was helping McNeely.

211. The black employees began to complain on the floor, to include: Quanisha Krishman ("Krishman"), Gabriel, and DBriscoe.

212. That same day, Ross put in a request for DBriscoe to speak to Kyker regarding Smith's disparate treatment of McNeely compared with Carlson and the attempted intimidation of DBriscoe.

213. Ross spoke to Kyker directly regarding the request for DBriscoe to meet with Kyker about Smith's mistreatment of DBriscoe.

214. Kyker responded that he (Kyker) will get in touch with DBriscoe's supervisor to set up a meeting with HR.

215. DBriscoe never received a call from HR or anyone else about having a meeting about his (DBriscoe's) complaints against Smith.

216. Shortly after this, on February 6, 2024, DBriscoe was called into Kyker's office with Smith. This was the week before the end of DBriscoe's 90-day probation period.

217. This was the first time that DBriscoe had ever seen Kyker.

218. Kyker told DBriscoe that Tyson was going to let DBriscoe go because it wasn't working out and making generalized statements without any definition or objective evidence, using terms like attitude and poor performance, without further explanation.

219. Not understanding, DBriscoe asked Kyker for an explanation of why Kyker was terminating DBriscoe.

220. Kyker mentioned the E-Stop cord pull from early in January; even though DBriscoe had not done anything wrong and had not been disciplined for it back when it had occurred (and even though others had also not been disciplined for pulling the E-Stop cord). Kyker then mentioned the phone use in the nurse's office.

221. No one gave DBriscoe any other explanation for his termination.

222. As such, DBriscoe was subjected to racially and retaliatory disparate mistreatment in that termination.

223. DBriscoe's racially discriminatory or retaliatory experiences included his own disparate experiences as well as those of other black employees and employees that had engaged in protected activity (to include but not be limited to: Savage, and others) being treated differently than the non-black and non-protected-activity-engaging employees as well as the consistent failure or refusal of Tyson to take actions to oppose or stop the racially offensive, retaliatory, and disparate conduct and actions that had occurred over a period of years prior to Parker voluntarily demoting in protest to the racial discrimination at Tyson.

224. The sum total of these consistent, known, repeated, and unremediated racially and retaliatory disparate mistreatment of DBriscoe and other black employees or employees

that engaged in protected activities amount to a hostile work environment for all black employees at Tyson's Sherman facility during the actionable period in this case.

225. No one should have to put up with that kind of mistreatment because of their race or protected activities.

226. As a result of Tyson's racially discriminatory or retaliatory actions against DBriscoe and other black employees, DBriscoe has suffered economic and non-economic damages (humiliation, abandoned, mental anguish and stress, sense of failure, lethargy, depression), both statutory and equitable in nature, and attorney's fees and costs, for which he seeks recovery.

227. Because of the consistent and known effect of much of the conduct complained of herein, DBriscoe also asserts that Tyson has engaged in intentional and malicious conduct such that it should be subjected to punitive damages to deter such conduct in the future.

**Jermeka Briscoe**

228. JBriscoe is African American.

229. JBriscoe has worked for Tyson from August 21, 2008 to present.

230. JBriscoe started in Pork for two and a half years and then moved to Beef Slice on A-Shift until approximately four months ago when she transferred to Housekeeping under supervisor Katherine Snaverly ("Snaverly").

231. JBriscoe transferred away from Beef Slice at the direction of her doctor to get away from the cold in the facility.

232. While JBriscoe was working in Beef Slice, she worked under General David Medler's ("Medler") chain of command.

233. Medler had/has a reputation as a racist due to his use of the n-word against black employees and by his disparate treatment of black employees at Tyson.

234. JBriscoe had at least two racially negative experiences with/from Medler.

235. One involved a false allegation in 2022 from Medler in an attempt to terminate JBriscoe.

236. Medler approached JBriscoe when JBriscoe arrived at work, told JBriscoe not to clock in, and to go with Medler to HR.

237. When Medler and JBriscoe arrived at HR, Medler went in to speak with Webb first and then after a while, they called in JBriscoe.

238. Webb, with Medler present in the room, asked JBriscoe why she had cursed at her supervisor.

239. JBriscoe told Webb that she had no idea what she was talking about as JBriscoe had not ever raised her voice or cursed at her supervisor.

240. JBriscoe's supervisor was Josh Halley ("Halley") and JBriscoe asked Webb to get Halley up to HR and ask him.

241. When Halley arrived, Halley confirmed, with Medler present in the room, that JBriscoe had not cursed at Halley or otherwise engaged in misconduct.

242. Webb apologized to JBriscoe, but JBriscoe asked Webb, while Medler was still in the room, what was going to be done about Medler making a false allegation against JBriscoe.

243. Webb said that she would look into it. Medler made no comment including not apologizing to JBriscoe.

244. Webb asked JBriscoe to step out leaving Halley, Medler, and Webb in the room. After about 10 minutes the three came out, Halley instructed me to return to work and nothing else was said the JBriscoe.

245. JBriscoe never heard about an investigation or any consequences to Medler for his false allegations against JBriscoe.

246. Medler had never mistreated a non-black employee in a similar way.

247. Some weeks after that, still in 2022, the safety representative, Chris Sutherland ("Sutherland") had approached JBriscoe about a hoodie she was wearing that had a string still present (strings were not allowed on hoodies due to the safety risk). JBriscoe explained that there had recently been a house fire at her home and JBriscoe had lost most, if not all, of her clothes and this was the only item left from JBriscoe's sister who had recently passed away.

248. Sutherland told JBriscoe that he would let JBriscoe continue to wear that hoodie for the rest of the shift if JBriscoe allowed Sutherland to cut the strings back to remove the safety violation. JBriscoe agreed and Sutherland cut the string and allowed JBriscoe to continue working after removing the safety violation.

249. Later that same day, Medler called JBriscoe out and told her that this was a violation and it was going to go into her file.

250. Even though JBriscoe told Medler that Sutherland had cut the string and allowed her to continue working that same day, Medler proceeded to discipline JBriscoe.

251. Shortly after that, Medler was moved from Beef Slice to Pork Slice following allegations that Medler had used the n-word related to black employees at Tyson.

252. This was not the first time that Medler had been reported to use the n-word at work.

253. During the entire time JBriscoe worked for Tyson, she was qualified for each job and performed the duties of each job at or above Tyson's expectations and the training Tyson communicated to JBriscoe and its other employees in the roles that JBriscoe filled.

254. Shortly after JBriscoe began working in Housekeeping, she learned that a white female housekeeper, Ashley Guillory ("Guillory"), was in a Lead position and making more money than JBriscoe even though there was not Lead position in existence at that time and Guillory was not doing any more work than JBriscoe and Guillory had not received the pay raise through an open and fair bidding process for the position or raise.

255. Tyson denied to JBriscoe that Guillory had been in a Lead position and also denied that Guillory was being paid more than JBriscoe.

256. This was a false denial and no consequences resulted against anyone involved in this racially disparate treatment of Guillory over JBriscoe.

257. On June 12, 2024, at approximately 11:30am, JBriscoe was cleaning the Men's restroom at the facility.

258. JBriscoe had followed the protocols she was trained to perform to indicate that she was cleaning the restroom and to block entrance to the restroom while she cleaned.

259. Tyson's male employees were also trained not to use the restrooms while they are being cleaned, if it was not already patently obvious that they were being cleaned and therefore should not be used.

260. Regardless, a male employee, Sui not only pushed aside the signage and cart and entered the restroom, but also upon seeing JBriscoe, Sui exposed his penis to JBriscoe several steps before getting to the urinal thus obviously intending to expose his penis to JBriscoe and not simply urinate privately.

**31**

261. JBriscoe was shocked and terrified given prior traumatic experiences in her life that JBriscoe communicated to Tyson representatives on multiple occasions.

262. JBriscoe immediately left the restroom and went to report it to Kyker with Sui still present in the restroom.

263. Kyker told JBriscoe that Kyker would, "get to the bottom of it."

264. JBriscoe heard nothing from Kyker or anyone else about her complaint against Sui and also observed that Sui never missed a day of work during this time establishing that he had not been suspended in any way.

265. Then, a month later, on July 15, 2024 at approximately 8:57am, JBriscoe was again cleaning the Men's restroom at the facility with all of the proper signage and cart blocking the entrance to the restroom according to Tyson's policies and training.

266. This time an employee named Nareshkumar Lad ("Lad") moved the cart and signage and entered the Men's restroom while JBriscoe was cleaning the Men's restroom at the facility and exposed himself to JBriscoe similar to the way that Sui had done by exposing his penis before getting to the urinal.

267. This time, JBriscoe was frightened and immediately left the restroom with Lad still there.

268. JBriscoe reported Lad's exposing his penis to her to a Ground Beef Lead named Shannon Jones (white), who happened to be passing by in the hallway.

269. Jones went in the men's restroom to get Lad.

270. When Lad came out, Lad said that he, "didn't know the rules."

271. At that time a Maintenance General, David Shelton ("Shelton"), was coming by and joined the communication about what had just happened. Shelton told Lad, "You can't do this."

272. Shelton went on to convey to Lad that when the cart is there and the sign is displayed, employees are not allowed to enter the restroom. Shelton also told Lad not to do it again.

273. Then just a few minutes later, a third man, entered the restroom while JBriscoe was still cleaning. This time, even though the man was beginning to open his trousers to expose himself, JBriscoe left immediately screaming and was able to leave before being exposed to another man's penis.

274. This was very upsetting and triggering for JBriscoe again due to her traumatic history of which Tyson had been previously made aware by JBriscoe when JBriscoe had told Webb about it.

275. This time JBriscoe went to report this third intrusion in one month while JBriscoe was cleaning the men's room to Webb in HR.

276. Webb told JBriscoe that she would bring it to Kyker's attention.

277. JBriscoe was dejected since Kyker had originally done nothing to take action against Sui's misconduct or anything else to stop the sexual harassment and abuse against JBriscoe.

278. When JBriscoe spoke to the Plant Manager, Tom Sharp ("Sharp"), Sharp told JBriscoe that she should not expect male employees to do anything else if the restroom entrance is not blocked off.

279. In making that statement, Sharp ignored the fact that JBriscoe had followed the signage protocol established by Tyson (to include blocking the door with the cart and posting the "CLOSED FOR CLEANING" sign) and more importantly ignored the fact that these three male employees had not just entered the restroom while JBriscoe was in there cleaning but also had or were attempting to expose themselves to JBriscoe and not merely urinating.

280. JBriscoe also spoke to her supervisor, Snaverly, who told JBriscoe that Snaverly had viewed the video from that day, July 15th, that JBriscoe had utilized the proper signage and protocols and was not at fault in any way.

281. Snaverly then said that Tyson would get JBriscoe chains so that the restroom could be locked up, but that has not happened.

282. After JBriscoe complained of being sexually harassed by men repeatedly exposing their penises to her while at work in violation of Tyson policy and training, Guillory reported to Tyson that she felt uncomfortable working in the same vicinity as a black male employee, even though the black male employee had not been accused of touching, threatening, exposing, or otherwise sexually harassing Guillory.

283. Tyson did an investigation and found that the black male had not done anything inappropriate, so no action was taken.

284. JBriscoe was treated differently than Guillory, because even though JBriscoe had been harmed with actual sexual harassment and abusive mistreatment multiple times, nothing was done to protect JBriscoe, while Guillory received an investigation when no misconduct was even alleged or found against the black male employee.

285. As referenced above, JBriscoe experienced and witnessed multiple racially discriminatory and retaliatory actions and a hostile work environment to include the following racially disparate treatments: false and fabricated allegations; false disciplinary actions; and denial of protection from sexual harassment when non-black employees received protection under less harmful allegations and actions.

286. Those illegal racially discriminatory actions taken by Tyson against JBriscoe are included in this Complaint to provide relevant background evidence and context for JBriscoe's and the other plaintiffs' actionable claims in this suit.

287. JBriscoe knows of no instance where Tyson or HR ever substantiated or verified a complaint of race discrimination or retaliation.

288. JBriscoe observed and believes that, in addition to herself, the following black employees were also treated differently because they are black: Savage, LaToya Hawkins, LaTonya Roberts, Willie Coleman, Bridgette Parker, Wilma Ross, and others.

289. JBriscoe experienced a distinct and separated workplace while working for Tyson in Sherman compared to Tyson's treatment of non-black (and non-protected-activity-engaging) employees.

290. JBriscoe's racially discriminatory experiences included her own disparate experiences as well as those of other black employees (to include but not be limited to: Wilma Ross, and others) being treated differently than the non-black employees. Tyson also refused to stop the racially offensive and disparate conduct that occurred over many years. For example, Robin Goss ("Goss") Medler who have engaged in multiple instances of racial discrimination against black employees yet are both still employed by Tyson.

291. The sum of these consistent, known, repeated, and unremediated racially disparate mistreatments of JBriscoe and other black employees amount to a hostile work environment for all black employees at Tyson's Sherman facility during the actionable period in this case.

292. No one should have to put up with that kind of mistreatment because of their.

293. As a result of Tyson's racially discriminatory actions against JBriscoe and other black employees, JBriscoe suffered economic and non-economic damages (humiliation, mental anguish and stress, sense of failure, headaches, lethargy, and depression), both statutory and equitable in nature, and attorney's fees and costs, for which he seeks recovery.

294. Because of the consistent, unremediated, and known effect of much of the conduct complained of herein, JBriscoe also asserts that Tyson has engaged in intentional and malicious conduct such that it should be subjected to punitive damages to deter such conduct in the future.

**Tony Ross**

295. TRoss is African American.

296. TRoss worked for Tyson from July 2022 to March 2023.

297. TRoss worked in Pork Slice under Supervisor Jimmy Chen (Chin) and also under General David Medler ("Medler") (white).

298. After approximately five months working for Tyson, Chen and Medler began telling TRoss that he had to ask them for permission to go the restroom.

299. TRoss had been trained that he was not required to request permission to go to the restroom.

300. TRoss had observed that other employees were not required to request permission before going to the restroom.

301. TRoss had also observed that both Chen and Medler would observe other employees going to or returning from the restroom during their shift without having asked for permission and these employees were not counseled or disciplined by Chin or Medler for going to the restroom without having asked permission.

302. Chin had previously told TRoss that there is no policy about asking for permission to go to the restroom.

303. TRoss had specifically asked during training about going to the restroom and Chin's response was, "We're all adults here, you don't have to ask."

304. TRoss's first several months involved him using the restroom without having to request permission and both Chin and Medler never spoke to TRoss about it at all.

305. This changed after TRoss got sick one day requiring him to use the restroom several times. This culminated in TRoss eventually vomiting, going to the nurse, and being sent home by the nurse.

306. Before TRoss was sent home, Medler and Chin were complaining that TRoss was going to the restroom too much.

307. Medler and Chin gave TRoss a written warning for being gone from his workstation for too long on the same day that TRoss was sent home for being too sick to work.

308. TRoss was at home sick for three days.

309. TRoss went to get a doctor's note before coming back to work as instructed by Tyson.

310. A few weeks after TRoss returned to work, TRoss learned that Tyson had a new App called Beekeeper that Tyson wanted its employees to use. However, TRoss was not provided with the App or trained in how to download or use it.

311. After TRoss had his lunch break, TRoss was instructed to get in line to get the App from the HR representatives that were assisting and instructing the employees on how to download and use the App.

312. TRoss was in line for some period of time that resulted in TRoss returning to work later than TRoss would have returned after lunch had he not been instructed to stand in line regarding downloading and being trained on the usage of the App.

313. Despite TRoss telling Medler and Chin about TRoss being instructed to stand in line regarding the App, Medler and Chin called TRoss to the office for returning to work late from lunch,

314. Medler and Chin said that TRoss should have already had it without explaining how TRoss was supposed to have already had the App.

315. Medler then suspended TRoss for 3 days without pay for being back from lunch late.

316. Medler inexplicably went forward with the suspension even though TRoss confirmed with the HR representative, while Medler was present, that TRoss was late back from lunch because TRoss was with the HR representative getting the Beekeeper App.

317. Not long after TRoss returned to work from the unjust suspension without pay, TRoss had a disagreement with a co-worker, Vonda Traweek ("VTraweek"), who was harassing TRoss about an issue that had nothing to do with VTraweek's work responsibilities.

318. TRoss asked VTraweek to please leave him alone and mind her own business.

319. Another co-worker, Analee, told TRoss that she had observed what had happened between VTraweek and TRoss and that TRoss should report to the supervisor that VTraweek is bothering TRoss about non-work-related business.

320. In the meantime, VTraweek had gone to her husband, Travis Traweek ("TTraweek"), who also works at Tyson. TTraweek is not a supervisor and is also white.

321. VTraweek also began lying about what TRoss had said or done.

322. TRoss went to TTraweek and told him that VTraweek was in TRoss's business and asked TTraweek if he would please ask her to leave TRoss alone. TTraweek refused to speak to his wife about TRoss.

323. VTraweek then approached TRoss saying, "What the fuck are you doing talking to my husband."

324. TRoss responded to VTraweek, saying "chill out."

325. VTraweek responded loudly and in anger with, "What the fuck, you motherfucker!" "You shouldn't have said anything to my husband!" and "I'm going to get you fired!"

326. TRoss went to Chin to ask Chin to tell VTraweek to leave TRoss alone and to tell VTraweek to stop harassing TRoss.

327. Chin told TRoss, "Just ignore her."

328. As threatened, VTraweek went to Medler and Chin.

329. Medler called TRoss to the office.

330. When TRoss got to the office, Medler and Chin were there and no one else.

331. They did not ask TRoss any questions.

332. Medler told TRoss that VTraweek said that TRoss had threatened both VTraweek and TTraweek.

333. TRoss denied that had threatened anyone. TRoss also told them that there were witnesses to the exchange between he and VTraweek and TTraweek.

334. TRoss also told Medler that it was VTraweek that had threatened TRoss with getting him fired and that the witnesses could also confirm that.

335. Both Analee and Marquel Dunlap ("Dunlap"), who witnessed the exchanges, both confirmed that TRoss had not threatened VTraweek and that it was VTraweek who had been the instigator.

336. Despite the information gathered showing that TRoss had not engaged in any misconduct, Medler suspended TRoss without pay and did nothing to VTraweek.

337. While on suspension, TRoss requested to meet Plant Manager McKeeman.

338. McKeeman told TRoss, "You shouldn't have said anything and shouldn't have gone to the husband."

339. During the meeting, McKeeman also brought up TRoss's bathroom use discipline without reference to TRoss being sick and being sent home that same day by Tyson's nurse.

340. McKeeman did not take into consideration the witness statements and then increased the penalty against TRoss by adding on more dates of suspension without pay.

341. TRoss then called the Corporate office while he was on suspension asking to report what had just happened.

342. A couple of days after returning to work after completing the additional days of unpaid suspension from McKeeman, TRoss had a Zoom call with a Sanchez ("Sanchez") from Tyson's Corporate Office.

343. TRoss told Sanchez, that TRoss was being mistreated due to TRoss being black and went into detail about the events mentioned above.

344. Sanchez told TRoss that Sanchez would investigate and get back to TRoss.

345. TRoss never heard back from Sanchez.

346. Instead, approximately two weeks later, in March 2023, Tyson terminated TRoss.

347. Medler accused TRoss of looking at his phone while on the floor.

348. Looking at your phone while on the floor is a violation of Tyson policy and a terminable offense for a Tyson employee.

349. However, there are several problems with this reason for terminating TRoss:

- TRoss was not looking at his phone on the floor,
- TRoss had looked at his watch,
- TRoss did not have his phone with him on the floor,
- There is no restriction against looking at your watch while on the floor,
- Tyson has not consistently enforced the policy regarding looking at one's phone while on the floor, or put another way,
- Tyson has consistently allowed non-black and non-protected activity engaging employees to look at their phones on the floor without terminating them.[2]

350. Medler took TRoss to McKeeman, without HR present, which is against policy and practice at Tyson.

351. TRoss again raised the racially discriminatory appearance of how TRoss was being mistreated by Medler and McKeeman.

---

[2] For example, Tyler McDermott (white supervisor, looked at his phone and not disciplined, much less terminated) and Kathy Hurtado (white, looked at her phone and not disciplined, much less terminated), and multiple others with witnesses who can confirm both the employees looking at their phones and the supervisors seeing it happen and taking no action to stop it or discipline the employees for the violation.

352. McKeeman terminated TRoss without investigation or explanation.

353. TRoss showed McKeeman his watch, that he did not have his phone with him, and even asked McKeeman to watch the video of him on the floor to see for himself that TRoss had not been looking at his phone, but McKeeman refused to either look at the video or allow TRoss or anyone else view the video.

354. This greatly depressed TRoss because of the injustice of the termination, the fact that TRoss had a third child that was going to be born any day then.

355. It was common knowledge at Tyson that Medler had said while at work, "I wish all n-words would die."

356. The only consequence from Tyson against Medler was to move Medler from Beef Slice General to Pork Slice General without demotion or other negative consequence.

357. Tyson does not terminate the non-black employee(s) that Tyson knows who do not work while on the clock during their shifts. Tyson managers and representatives are aware of the non-black employee(s) not working on the clock and do nothing to stop it.

358. TRoss observed and believes that, in addition to himself, the following black employees were also treated differently because they are black or because they opposed discrimination at Tyson in Sherman: LaToya Hawkins, Savage, Lamay, and Bridgette Parker.

359. TRoss's racially discriminatory or retaliatory experiences included his own disparate experiences as well as those of other black employees and employees that had engaged in protected activity (to include but not be limited to: LaToya Hawkins, Savage, Lamay, and Bridgette Parker, and possibly others) treated differently than the non-black and non-protected-activity-engaging employees as well as the consistent failure or refusal of

**42**

Tyson to take actions to oppose or stop the racially offensive, retaliatory, and disparate conduct and actions that occurred years prior to TRoss's termination.

360. The sum-total of these consistent, known, repeated, and unremediated racially and retaliatory disparate mistreatments of Ross and other black employees or employees that engaged in protected activities amount to a hostile work environment for all black employees at Tyson's Sherman facility during the actionable period in this case.

361. No one should have to put up with that kind of mistreatment because of their race or protected activities.

362. As a result of Tyson's racially discriminatory or retaliatory actions against TRoss and other black employees, TRoss suffered economic and non-economic damages (humiliation, mental anguish and stress, sense of failure, lethargy, depression), both statutory and equitable in nature, and attorney's fees and costs, for which he seeks recovery.

363. Because of the consistent, unremediated, and known effect of much of the conduct complained of herein, TRoss also asserts that Tyson has engaged in intentional and malicious conduct such that it should be subjected to punitive damages to deter such conduct in the future.

## Damages

364. Because of statutorily impermissible and willful, if not malicious, acts of Tyson and its representatives, Plaintiffs have suffered loss of income, loss of benefits, loss of career opportunity, and loss of advancement.  Because of the unlawful and outrageous actions of Tyson, Plaintiffs have suffered humiliation, loss of standing in the community, emotional pain and suffering, inconvenience, loss of enjoyment of life, irritation, and mental

**43**

anguish.  Plaintiffs seek recovery, compensatory, and equitable (i.e., back pay and front pay), and punitive damages, as well as attorney's fees, and costs, including on appeal if necessary, and pre and post judgment interest in the maximum amounts allowed by law.

### Relief Requested

Paragraphs one (1) through three hundred sixty four (364) of this complaint are incorporated by reference and made a part of Relief One through Relief Four, inclusive.

### EQUITABLE RELIEF

### Relief One

Plaintiffs seek awards of back pay and front pay as well as lost retirement damages for the losses of income that Plaintiffs have suffered and will continue to suffer because of Tyson's racially discriminatory and/or retaliatory-based mistreatment in the past and into the future.

### Relief Two

Plaintiffs are entitled to awards of pre- and post-judgment interest on any amounts awarded to them.

### LEGAL RELIEF

### Relief Three

Plaintiffs are entitled to back and front compensatory, expectation, consequential, and punitive damages due to the illegal, malicious, and/or recklessly indifferent actions by Tyson as alleged herein pursuant to 42 U.S.C §1981 (1991 Act).

### Relief Four

Plaintiffs are entitled to reasonable attorney's fees and costs, including on appeal if necessary. 42 U.S.C §1981 (1991 Act).

**44**

## PRAYER FOR RELIEF

Plaintiffs request the Court to cause Tyson to be cited to appear and answer in this Court, and that upon final hearing, the Court grant to Plaintiffs as follows:

1.  Grant Plaintiffs judgment in their favor against Tyson;

2.  Grant Plaintiffs all equitable damages including back pay, front pay, and other employment and retirement benefits;

3.  Grant Plaintiffs back and front compensatory damages for Tyson's acts of racial discrimination, retaliation, and hostile work environment against them;

4.  Grant Plaintiffs punitive damages for Tyson's willful and malicious acts of discrimination, retaliation, and hostile work environment against them, pursuant to 42 U.S.C §1981 (1991 Act);

5.  Grant Plaintiffs pre- and post-judgment interest in the highest lawful amount;

6.  Grant Plaintiffs reasonable attorney's fees, together with their costs;

7.  Grant Plaintiffs reasonable attorney's fees and costs for any appeals of a ruling in Plaintiffs' favor, and

8.  Such other and further relief as the Court determines justice and equity so require.

Respectfully submitted,

*/s/ Robert Notzon*
Robert S. Notzon
State Bar No. 00797934

The Law Office of Robert Notzon
1502 West Avenue
Austin, TX 78701
512.474.7563 (Telephone)
512.852.4788 (Fax)
robert@notzonlaw.com

Brian P. Sanford
State Bar No. 17630700
bsanford@sanfordfirm.com
Elizabeth "BB" Sanford
State Bar No. 24100618
esanford@sanfordfirm.com

The Sanford Firm
1910 Pacific Ave., Suite 15400
Dallas, TX 75201

**ATTORNEYS FOR PLAINTIFFS**